.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **ERICA DANDRY CONSTANZA, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **CASE NO. 24-871** |
| **SPARTA INSURANCE COMPANY, ET AL.** | **SECTION: "G"(3)** |

**ORDER AND REASONS**

Before the Court is Plaintiffs Erica Dandry Constanza and Monica Dandry Hallner's ("Plaintiffs") Motion to Exclude to Exclude Defendants' Soil Testing.[1] In this litigation, Plaintiffs allege Decedent Michael P. Dandry, Jr. ("Decedent"), while an employee for Defendant Huntington Ingalls, Inc. ("Avondale"), was exposed to asbestos and asbestos-containing products manufactured, distributed, sold, and/or handled by Avondale and other parties.[2] Plaintiffs allege this exposure caused and/or contributed to Decedent's development of mesothelioma and, ultimately, his death.[3] On the other hand, Defendants advance an alternate theory of asbestos exposure from other sources, including on properties near Decedent's childhood home and workplace.[4] Considering the motion, the memoranda in support and opposition, the record, and the applicable law, the Court denies the motion.

[1] Rec. Doc. 591.

[2] Rec. Doc. 1-3 at 2.

[3] *Id.*

[4] Rec. Doc. 243.

## I. Background

Reagan Maloney was originally hired by Avondale to take soil samples and test for asbestos contamination from various addresses in Marrero, La, the city where Decedent lived and worked.[5] On February 23, 2026, the Court granted in part Plaintiffs' "Motion to Exclude Testimony and Report of Reagan Maloney and All Expert Testimony that Relies Upon the Reagan Maloney Report and Soil Samples"[6] to the extent that it sought to exclude the testimony and report of Reagan Maloney, and the portions of other experts' reports and testimony that rely on the report and soil samples of Reagan Maloney, because Avondale destroyed the soil samples after testing.[7] Ultimately, Plaintiffs were denied the right to examine and/or test the samples.

On March 2, 2026, the Court granted Defendant Bayer CropScience, Inc.'s ("Bayer")[8] Motion to Continue Trial "for the limited purpose of allowing the parties to conduct soil testing at and around the Dandry family property."[9] The Court further ordered that the parties must request leave of Court and present good cause to conduct any additional discovery or to file any motions related to the new soil samples.[10] The Court set forth a specific protocol to be followed for the soil testing.[11] The Court ordered the parties to confer and attempt to agree on the addresses from which

[5] Rec. Doc. 194-4.

[6] Rec. Doc. 194.

[7] Rec. Doc. 515.

[8] Bayer CropScience, Inc., as Successor to Rhone-Poulenc AG Company, f/k/a Amchem Products, Inc., f/k/a Benjamin Foster

[9] Rec. Doc. 534 at 6.

[10] *Id.* at 7.

[11] *Id.*

soil would be collected.[12] If the parties were unable to agree on the locations where soil will be collected, the Court ordered the parties to meet with the assigned Magistrate Judge to resolve any dispute.[13] Ultimately, the parties could not agree on the scope of the soil sampling.[14] Following a status conference, the Magistrate Judge ordered that soil sampling would occur on all areas proposed by the parties.[15]

Defendants retained Terracon Consultants ("Terracon") to collect this second round of soil samples.[16] Terracon collected thirty-five soil samples from twenty-one locations.[17] Sixteen of these sampled locations were the same locations previously sampled by Avondale, which include the following properties: driveway, parking lot, and yards of 411 Meyers Blvd., 413 Meyers Blvd., 413 ½ Meyers Blvd., 423 Meyers Blvd., and 5919 Fourth St. in Marrero, La., as well as outside of the fence of 5919 Fourth Street and 413 ½ Meyers Blvd., near a canal (collectively, the "Neighboring Properties").[18] The other five sampled locations were located between the Ali & Sons Grocery and 407/409 Meyers Blvd.[19] Terracon, in turn, retained EMSL Analytical, Inc. ("EMSL") to perform the lab testing of said samples.[20] Based on EMSL's testing of the samples

---

[12] *Id.*

[13] *Id.*

[14] Rec. Doc. 591-1 at 2.

[15] Rec. Doc. 542.

[16] Rec. Doc. 604.

[17] Rec. Doc. 591-1 at 1.

[18] *Id.* at 2. The soil samples collected at the Neighboring Properties are designated as samples B-1 through B-16.

[19] *Id.* at 2–3.

[20] Rec. Doc. 604.

taken from the twenty-one above-referenced locations, Terracon produced the Limited Site Investigation Report (the "Terracon Report").[21]

On September 9, 2026, after obtaining leave of Court, Plaintiffs filed the instant motion, which was set for submission on September 18, 2026. Here, Plaintiffs request that the Court exclude all testing by EMSL, the Terracon report, and any expert testimony based on said testing or, in the alternative, testing by EMSL relating to the Neighboring Properties samples.[22] On September 16, 2026, Avondale and Bayer each filed an opposition to Plaintiffs' motion.[23] Finally, on September 22, 2026, Plaintiffs filed their reply in further support of the instant motion.[24]

## II. Parties Arguments

### *A. Plaintiffs' Arguments in Support of Exclusion*

Plaintiffs assert that Defendants intend to use the EMSL testing improperly. Specifically, according to Plaintiffs, Defendants intend to use EMSL's testing to imply to the jury that harmful asbestos was present in and around the Ali & Sons Grocery store in 2026 and that this same condition would have existed . . . when Michael Dandry, Jr.'s grandparents owned the property."[25] Plaintiffs, therefore, request that the Court exclude all EMSL testing, the Terracon report, and any expert testimony based on said testing.[26] Alternatively, Plaintiffs request that the Court exclude all

---

[21] Rec. Doc. 591-7.

[22] Rec. Doc. 591.

[23] Rec. Docs. 604, 609.

[24] Rec. Doc. 618.

[25] Rec. Doc. 591-1 at 4.

[26] Rec. Doc. 591.

testing by EMSL pertaining to the samples taken at the Neighboring Properties.[27]

Plaintiffs chiefly argue that the EMSL testing should be excluded in its entirety under Federal Rules of Evidence 702 and 403.[28] With respect to Plaintiffs' Rule 702 challenge, Plaintiffs contend that the Court should exclude all EMSL testing because (1) "EMSL failed to follow proper protocol and methodology in its testing performed on the samples" and (2) "the 2026 testing is not helpful to the trier of fact in assessing a fact at issue."[29]

Plaintiffs argue that EMSL failed to follow proper protocol and methodology because EMSL failed to analyze all 35 soil samples with both Transmission Electron Microscopy ("TEM") and Polarized Light Microscopy ("PLM"). Plaintiffs assert that EMSL's corporate representative, Michelle McGowan ("Ms. McGowan"), testified that using both TEM and PLM is the "gold standard" and that EMSL's internal documents establish that both TEM and PLM were to be used to test all the samples collected by Terracon.[30] According to Plaintiffs, "PLM has limitations with both identifying fibers as well as sizing fibers."[31] On the other hand, "TEM confirms fiber type by chemical composition of the fiber and also determines the size of the fiber."[32] Plaintiffs contend that the identity and size of asbestos fibers "are critical to Defendants' experts for determining if asbestos results in a health hazard."[33] Therefore, because only 3 of 35 samples were analyzed using

---

[27] *Id.*

[28] Rec. Doc. 591-1 at 3.

[29] *Id.* at 3.

[30] *Id.* at 6–7.

[31] *Id.* at 7.

[32] *Id.*

[33] *Id.* at 7 (citing Rec. Doc. 591-3 (Deposition of EMSL (Through Michelle McGowan)).

TEM, Plaintiffs insists that EMSL's testing is "scientifically invalid."[34]

Plaintiffs argue that EMSL's testing is unhelpful to the trier of fact because "presence of asbestos in soil . . . is not the same thing as demonstrating human exposure."[35] Plaintiffs also submit that "Terracon admitted in its report that use of the report and test results should not be relied upon to '[q]uantify the nature, magnitude, concentration, or distribution of any identified materials' and should not be relied upon to '[a]ssess risk to human health, safety, or the environment.'"[36] Furthermore, according to Plaintiffs, EMSL did not test whether the asbestos could become airborne, despite "hav[ing] a testing procedure for determining the likelihood of asbestos being released from a soil sample."[37]

With respect to Plaintiffs' Rule 403 challenge, Plaintiffs argue that the Court should exclude all EMSL testing because "the 2026 testing is in no way representative of the conditions of the property as they existed during the time period at issue in this case."[38] As such, Plaintiffs assert that the probative value of the 2026 testing is substantially outweighed by the testing's "prejudicial nature" and likelihood of confusing the issues and misleading the jury.[39]

On the other hand, Plaintiffs alternatively request that the Court exclude EMSL testing pertaining only to the samples taken at the Neighboring Properties under Rule 403.[40] Plaintiffs

---

[34] *Id.* 7–8.

[35] *Id.* at 8.

[36] *Id.* at 4–5.

[37] *Id.* at 8.

[38] *Id.* at 8–9.

[39] *Id.* at 9.

[40] *Id.*

admit that Decedent lived and/or visited the five sampled locations located between the Ali & Sons Grocery and 407/409 Meyers Blvd. However, Plaintiffs argue that EMSL's testing relating to the Neighboring Properties is irrelevant because the Dandry family never owned—nor did Decedent ever visit—the Neighboring Properties.[41] In particular, Plaintiffs point to Jefferson Parish's mortgage and conveyance records as well as the testimony of Rita Dandry Legendre, Decedent's sister, which Plaintiffs contends establish that the Dandry family never owned—nor did Decedent have the occasion to visit—any part of the Neighboring Properties.[42] Furthermore, Plaintiffs argue that any probative value this testing may have is substantially outweighed by the risk that the testing will cause prejudice, confuse the issues, and mislead the jury.[43]

### *B. Avondale's Arguments in Opposition of Exclusion*

In this case, Defendants refute that Decedent's illness was caused by Decedent's employment with Avondale and instead assert an alternate theory of asbestos exposure. Specifically, Defendants contend that Decedent's illness was caused exclusively by exposure from asbestos from Johns-Manville (the "Johns-Manville defense"). As such, Avondale requests that the Court deny the instant motion.

First, Avondale argues that Plaintiffs' alternative request for the exclusion of EMSL's testing pertaining only to the Neighboring Properties should be denied.[44] Avondale asserts that EMSL's testing of the Neighboring Properties is "highly relevant and probative" to the

---

[41] Rec. Doc. 591-1.

[42] *Id.* at 14–25.

[43] *Id.* at 10.

[44] Rec. Doc. 604.

Defendants' Johns-Manville defense.[45] Furthermore, Avondale argues that the ownership of the Neighboring Properties is inconsequential to the Court's relevancy analysis.[46] Avondale notes that there is evidence, specifically the testimony of Decedent's two sisters, that demonstrates Decedent potentially visited the Neighboring Properties, where Decedent may have been exposed to asbestos from Johns-Manville.[47] According to Avondale's industrial hygiene expert, James Shea, the results of the soil sampling in addition to the testimony by Decedent's sisters is evidence of Decedent's potential exposures from Johns-Manville.[48] Therefore, Avondale asserts that "[t]he Dandry family need not have owned all of the property where [Decedent] was exposed in order for the jury to find exposure attributable to Johns-Manville."[49] Ultimately, Avondale submits that "what properties are relevant, and whether [Decedent] sustained exposures to asbestos on those properties attributable to Johns-Manville, are questions for the jury to decide after considering the evidence and expert testimony presented at trial, including the EMSL soil test results."[50]

Second, Avondale argues that the Court should deny Plaintiffs' request to exclude all EMSL's testing because EMSL's testing satisfies Rule 702 and Rule 403. With respect to Rule 702, Avondale contends that EMSL's testing both followed proper methodology and protocol and is helpful to the jury.[51] Avondale asserts that EMSL analyzed the soil samples twice, pursuant to

---

[45] *Id.* at 3.

[46] *Id.* at 4.

[47] *Id.* at 4–5 (referencing Rec. Doc. 224-4 (Deposition of Madeline Lonegran dated April 23, 2025) and Rec. Doc. 224-3 (Deposition of Rita Legendre dated April 23, 2025)).

[48] *Id.* at 9–10.

[49] *Id.* at 4.

[50] *Id.* at 10.

[51] *Id.* at 10–11.

two distinct methods that are both "accepted, published method[s]" for determining the presence of asbestos or quantifying asbestos in soil.[52] Avondale claims that Plaintiffs' characterizations of Ms. McGowan's deposition testimony regarding proper testing methodology and whether EMSL followed such methodology "is both misleading and incorrect."[53] Furthermore, despite Plaintiffs' arguments to the contrary, Avondale asserts that Ms. McGowan "explain[ed] that the ASTM D7521-16 method as performed by EMSL includes both PLM testing and TEM Qualitative testing."[54] Avondale also asserts that "[its] medical expert, Dr. Bruce Case, confirmed that EMSL was following the standard, proper methodology and procedure in this matter."[55] Taken together, Avondale contends that "[t]he testimony of Ms. McGowan and Dr. Bruce Case reveals that protocol was proper and the methodology used by EMSL was valid and can reliably applied to the facts."[56]

Next, Avondale rebuts Plaintiffs' contention that the chemical composition and size of fibers determined by TEM analysis are necessary for Defendants' experts to determine whether the asbestos found in the various soil samples created a health hazard.[57] Avondale contends that Plaintiffs misconstrue the purpose of the soil sampling and then addressed the opinions of Mr. Shea and Dr. Case in turn.

---

[52] Specifically, EMSL first analyzed the soil samples pursuant to the American Society for Testing Material's ("ASTM") D7521-16 method for asbestos in soil, and second, pursuant to the AHERA Method 40 CFR 763 Subpart E Appendix E supplemented with EPA 600/R-93/116 using PLM and Milling Prep Quantitation using 400 Point Count Procedure. *Id.* at 12–13.

[53] *Id.* at 11.

[54] *Id.* at 14.

[55] *Id.* at 15.

[56] *Id.* at 16.

[57] *Id.* at 17.

Avondale argues that Mr. Shea's opinion, which is purportedly based on well-published studies regarding mesothelioma clusters on the Westbank, pertains only to Decedent's potential exposures to asbestos from Johns-Manville and Johns-Manville asbestos-containing scrap material.[58] Avondale denies that Mr. Shea is offering an opinion about whether the soil in and around the Dandry property (including the Neighboring Properties) would itself increase Decedent's risk of mesothelioma.[59] Avondale further notes that "[Mr. Shea] agrees with the qualifications in the Terracon Report about what the report should not be relied upon for" and "specifically testified that he did not rely upon the Terracon Report as representative of the condition of the soil in the 1950s."[60] Instead, it is Mr. Shea's opinion that the results of the soil sampling and the testimonial evidence provided by Decedents' sisters simply confirm that Johns-Manville scrap material was deposited on the sampled locations.[61] Furthermore, Avondale asserts that Mr. Shea's opinion is a qualitative evaluation, not a quantitative evaluation, of asbestos exposure.[62]

With respect to Dr. Case, Avondale argues that EMSL's report did not change—but is merely consistent with—Dr. Case's opinions.[63] Further, Avondale notes that Dr. Case testified that other evidence, including the testimony of Decedent's sister Rita, "supports his opinion that the asbestos [found in 33 of the 35 samples] most likely got there when the [Johns-Manville] scrap

---

[58] *Id.*

[59] *Id.* at 17–18.

[60] *Id.* at 18.

[61] *Id.* 18–19.

[62] *See id.* at 17–18.

[63] *Id.* at 20.

material was being deposited throughout the neighborhood around 1950 to 1955."[64] Avondale asserts that "Dr. Case testified that the soil test results are relevant because finding even a single fiber of crocidolite in a sample . . . signifies a potential exposure to crocidolite which can and does cause mesothelioma."[65]

Finally, Avondale argues that EMSL's testing satisfies Rule 403 because the probative value of EMSL's testing outweighs the risk of prejudice, confusion of the issues, and misleading the jury.[66] For the reasons stated above, Avondale argues that EMSL's testing and the expert reports based on the testing is relevant to proving Defendants' Johns-Manville defense. Avondale also contends that the Court has already recognized that the soil test results are "relevant and helpful" in the Court's Order and Reasons granting Bayer's Motion to Continue Trial to allow the parties to retest the soil at issue.[67] In the same Order, Avondale notes that the Court remarked that "Plaintiffs are free to assert their arguments regarding the relevancy of the soil samples to the jury at trial."[68] Further, Plaintiffs had the opportunity to perform independent testing on the soil samples, and Avondale contends that "[i]f Plaintiffs had a valid concern regarding the propriety of [EMSL's] test results," Plaintiffs would have conducted such testing.[69] Ultimately, Avondale asserts that "[b]ecause the soil test results are crucial evidence, and because Avondale does not intend to offer the EMSL soil test results as representative of the conditions of the soil in the 1950s,

[64] *Id.*

[65] *Id.* at 20.

[66] *Id.* at 22.

[67] *Id.* at 23 (citing Rec. Doc. 534).

[68] *Id.* (quoting Rec. Doc. 534).

[69] *Id.* at 25.

1960s, 1970s, or later, the probative value of the soil testing substantially outweighs any danger of prejudice or confusion of the issues."[70]

### *C. Bayer's Arguments in Opposition of Exclusion*

Bayer also requests that the Court deny the instant motion. In large part, Bayer puts forth the same arguments as Avondale. Ultimately, Bayer asserts that the "presence of asbestos in the soil . . . establishes, or at a minimum is evidence of, the fact that [Decedent] was heavily exposed to asbestos from the [Johns-Manville] Plant, which was directly across the street from where [Decedent] lived and worked. So heavily exposed, in fact, that the asbestos . . . can still be found in the soil at the property fifty years later."[71] Bayer submits that the testimony of defense experts Dr. Case and Dr. James Crapo supports this conclusion.[72]

However, Bayer's arguments in opposition differ from Avondale to the extent that Bayer directly rejects Plaintiffs' claim that the property located at the corner of Fourth Street and Meyers Boulevard is "neighboring property" never owned by the Dandry family.[73] Still, Bayer, like Avondale, maintains that the sampled locations remain relevant regardless of ownership because "[Decedent] lived, worked, and spent time in these locations while the [Johns-Manville] Plant was operational."[74]

Further, Bayer specifically argues that "[i]f Plaintiffs believe TEM analysis of all thirty-five samples would have yielded more informative results, the proper course is vigorous cross-

---

[70] *Id.* at 23.

[71] Rec. Doc. 609 at 3.

[72] *Id.* at 12.

[73] *Id.* at 7–8.

[74] *Id.* at 8.

examination of . . . Ms. McGowan, and the defense experts who rely on those results, not wholesale exclusion of the evidence."[75] Bayer also contends that, like Plaintiffs' other challenges, Plaintiffs' argument that the 2026 testing cannot address the exact environmental conditions which existed through the 1950s to the 1979s goes to the weight of the evidence, not the evidence's admissibility.[76]

### *D. Plaintiffs in Reply*

Plaintiffs maintain their Rule 702 and Rule 403 arguments in favor of the exclusion of all EMSL testing. Specifically, Plaintiffs maintain that EMSL's testing failed to use proper methodology and protocol by neglecting to analyze 32 of the 35 soil samples with both PLM and TEM.[77] Plaintiffs further reject that Ms. McGowan and Dr. Case's testimony establishes that proper methodology and protocol was followed here. To the contrary, Plaintiffs argue that Dr. Case is not qualified to comment on EMSL's methodology and protocol.[78]

Plaintiffs also reiterate that EMSL's testing is not helpful for the jury for the same reasons articulated above. First, Plaintiffs reassert the EMSL testing has no or limited probative value because: (1) EMSL's soil testing is not indicative of soil conditions in the 1950s, 1960s, or 1970s, (2) detecting asbestos in soil "is not the same thing as demonstrating human exposure," (3) EMSL's testing provides no information about whether the asbestos found in the soil samples could ever become airborne. Further, Plaintiffs also reassert that EMSL's testing tells the jury nothing about whether the fibers found in the soil samples can even cause disease because the

---

[75] *Id.* at 10.

[76] *Id.* at. 13.

[77] Rec. Doc. 618 at 7.

[78] Specifically, Plaintiffs assert that when deposed, "Dr. Bruce Case could not explain the difference in the use of the methodologies and why different results were obtained under both tests." *Id.* at 6.

testing as performed is not instructive on the size of the fibers nor the identity of the fibers (i.e., whether the fibers were chrysotile or crocidolite). Plaintiffs contend that Defendants have not addressed the issue of fiber type and size as it relates to Dr. Case or Dr. Crapo's medical causation opinions. Plaintiffs also argue that Dr. Case's testimony regarding the relevancy of EMSL's testing is contrary to precedent in this District.[79]

Plaintiffs also maintain EMSL's testing and the Terracon report cannot be used to "[q]uantify the nature, magnitude, concentration, or distribution of any identified materials" and to ""[a]ssess risk to human health, safety, or the environment." However, Plaintiffs contend that Bayer, in its opposition, admits its intention to use the EMSL testing for such improper purposes.[80]

Finally, Plaintiffs also maintain their Rule 403 arguments in favor of excluding the testing specifically pertaining to the Neighboring Properties. Plaintiffs again deny that any evidence exists which establishes that Decedent ever visited the Neighboring Properties, where Samples B1 through B16 were collected. Plaintiffs specifically refute Avondale and Bayer's characterization of the testimony of Decedent's sisters and note that Rita Legendre provided a post-deposition declaration in which Ms. Legendre confirmed that the "locations where the soil sampling was done was not the area where [Decedent] and/or our family would walk or park when visiting our grandparents or when visiting the shore repair shop at 409 Meyers Blvd."[81]

---

[79] "Dr. Case testified that the soil test results are relevant because finding even a single fiber of crocidolite in a sample indicates the presence of crocidolite which conveys risk for mesothelioma and signifies potential exposure to crocidolite which can and does cause mesothelioma." *Id.* at 5 (citing Rec. Doc. 604 at 20).

[80] *Id.* (citing Rec. Doc. 609, where Bayer asserts that "[the presence of asbestos] establishes, or to a minimum is evidence of, the fact that Mr. Dandry was heavily exposed to asbestos from the JM Plant, which was directly across the street from where he lived and worked. So heavily exposed, in fact, that the asbestos from the JM Plant can still be found in the soil at the property fifty years later").

[81] *Id.* at 15 (quoting Rec. Doc. 591-10).

## III. Legal Standard

District courts have considerable discretion to admit or exclude scientific evidence and expert testimony under Federal Rule of Evidence 702.[82] Rule 702 provides that an expert witness "qualified . . . by knowledge, skill, experience, training or education" may testify when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[83] For the testimony to be admissible, Rule 702 establishes the following additional requirements:

(1) the testimony [must be] based on sufficient facts or data,

(2) the testimony [must be] the product of reliable principles and methods, and

(3) the expert [must reliably apply] the principles and methods to the facts of the case.[84]

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that Rule 702 requires district courts to act as "gatekeepers" to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable."[85] The Court's gatekeeping function thus involves a two-part inquiry into reliability and relevance. First, the Court must determine whether the proffered expert testimony is reliable, which includes determining whether the reasoning or methodology underlying the expert's testimony is reliable as well.[86] The party offering the

---

[82] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138–39 (1997); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 371 (5th Cir. 2000).

[83] Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[84] Fed. R. Evid. 702.

[85] *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (clarifying that the court's gatekeeping function applies to all forms of expert testimony).

[86] *See Daubert*, 509 U.S. at 592–93.

testimony bears the burden of establishing its reliability by a preponderance of the evidence.[87]

In *Daubert*, the Supreme Court identified a number of factors that are useful in analyzing reliability of an expert's testimony: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) any evaluation of known rates of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) general acceptance within the scientific community.[88] In *Kumho Tire Co. v. Carmichael*, the Supreme Court emphasized that the test of reliability is "flexible" and that *Daubert*'s list of factors does not necessarily nor exclusively apply to every expert in every case.[89] The Court's overarching goal "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[90]

Second, the Court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will thereby assist the trier of fact to understand the evidence (that is, whether the expert testimony is relevant).[91]

The Court's role as a gatekeeper does not replace the traditional adversary system,[92] and "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception

---

[87] *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994)).

[88] *See Daubert*, 509 U.S. at 592–94.

[89] *Kumho Tire*, 526 U.S. at 142; *see also Seatrax*, 200 F.3d at 372 (explaining that reliability is a fact-specific inquiry and application of *Daubert* factors depends on "nature of the issue at hand, the witness's particular expertise and the subject of the testimony").

[90] *Kumho Tire*, 526 U.S. at 152.

[91] *See Daubert*, 509 U.S. at 591; Fed. R. Evid. 702.

[92] *See Daubert*, 509 U.S. at 596.

rather than the rule."[93] As the Supreme Court noted in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[94] "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[95]

On the other hand, district courts also exercise considerable discretion in assessing admissibility under Federal Rule of Evidence 403.[96] Rule 403 provides that district courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

## IV. Analysis

### 1. Whether the EMSL testing should be excluded under Rule 702.

#### *a. The Court's Reliability Inquiry.*

##### i. Whether EMSL's testing followed a reliable method.

Plaintiffs ask the Court to exclude the EMSL testing in its entirety under Rule 702 on the grounds that the testing failed to follow proper methodology and protocol. Plaintiffs argue that exclusion is appropriate here because EMSL did not test all 35 soil samples in accordance with the "gold standard" testing protocol (that is, with both PLM and TEM). According to Plaintiffs, the failure to analyze each soil sample with TEM renders EMSL's testing "scientifically invalid," as

---

[93] Fed. R. Evid. 702 advisory committee's note to 2000 Amendment.

[94] *Daubert*, 509 U.S. at 596 (citing *Rock v. Arkansas*, 483 U.S. 44, 61 (1987)).

[95] *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir.1996) (internal citations and quotation marks omitted).

[96] *United States v. Morris*, 79 F.3d 409, 411 (5th Cir. 1996).

PLM "has limitations with both identifying fibers as well as sizing fibers" while TEM "confirms" fiber type and size.[97]

On the other hand, Defendants submit that EMSL tested the soil samples twice, pursuant to two methods. First, EMSL analyzed the samples pursuant to American Society for Testing Materials ("ASTM") D7521-16 Method for Determination of Asbestos in Soil. Under this method, EMSL analyzed each sample using PLM. Defendants submit that TEM Qualitative testing is optional under ASTM D7521-16 Method for Asbestos in Soil. Therefore, only if the PLM examination indicated that no asbestos was detected in a given sample, did EMSL analyze that specific sample with TEM. As a result, EMSL only analyzed only 3 of the 35 samples with TEM.[98] Second, EMSL analyzed the sample pursuant to Asbestos Hazard Emergency Response Act ("AHERA") Method 40 CFR 763 Subpart E Appendix E supplemented with EPA 600/R-93/116 using PLM and Milling Prep Quantitation using 400 Point Count Procedure. Defendants submit that this second test was performed to "provide a further breakdown into the percentages of each type of asbestos (i.e., percentages of chrysotile or crocidolite) found in each sample."[99]

Defendants contend that Ms. McGowan's testimony "reveals that protocol was proper and the methodology used by EMSL was valid and can be reliably applied to the facts."[100] Specifically, Ms. McGowan testified that both methods employed by EMSL are "standard tests" for analyzing soil for asbestos.[101] Defendants assert that the 400 Point Count Procedure is also "an accepted,

---

[97] Rec. Doc. 591-1 at 7.

[98] *See* Rec. Doc. 591-7.

[99] Rec. Doc. 604 at 13 (alterations omitted).

[100] *Id.* at 16.

[101] *Id.* at 14 (citing Rec. Doc. 591-3).

published method used to quantify asbestos in the material."[102] Defendants submit that PLM was established by the American Society for Testing Materials, and the AHERA method is published at 40 C.F.R. 763 Subpart E Appendix E. Defendants further submit that EMSL's methodology "is generally accepted in the relevant community and can be replicated."[103]

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[104] The basis of an expert witness's opinion does not need to be the best methodology or protocol available, as Rule 702 only requires that the method be *reliable*.[105] Considering *Daubert's* reliability factors, the Court finds that EMSL's testing and reports are the product of reliable principles and methods, as is the Terracon report.

First, the methods employed by EMSL to analyze the soil samples for asbestos, identify the asbestos type, and quantify asbestos in the samples are all generally accepted methods within the scientific community. Second, each method has been published. The ASTM D7521-16 Method for Asbestos in Soil, which provides that TEM analysis is optional, was established by American Society for Testing Materials. The AHERA Method is published at 40 CFR 763 Subpart E Appendix E. Finally, EPA 600/R-93/116 using PLM and Milling Prep Quantitation using 400 Point Count Procedure has similarly been published by the Environmental Protection Agency.

---

[102] *Id.* at 13.

[103] *Id.* at 16.

[104] *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019)

[105] *See id.*; *see also In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), amended, 199 F.3d 158 (3d Cir. 2000) (citations omitted) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect. The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.").

Third, the methods employed by EMSL can be tested, meaning the techniques "can be challenged in some objective sense."[106] Not only can the testing be replicated, as half of each sample collected was preserved and forwarded to Plaintiffs,[107] but Plaintiffs will have the opportunity to challenge the EMSL testing, the Terracon report, and any expert testimony relying on the testing. Therefore, Defendants have satisfied their burden in establishing by the preponderance of the evidence that the EMSL testing followed reliable methods and principles and that the Terracon reports are the product of such testing.

**ii. Whether expert testimony relying on the EMSL testing may reflect a reliable application of the principles and methods to the facts of the case.**

In the instant motion, Plaintiffs request that "all expert testimony relying upon the [EMSL] testing" be excluded. Plaintiffs do not identify any specific testimony or opinion (by Dr. Crapo, Dr. Case, or any other defense expert) for which Plaintiffs presently request exclusion.

Here, Plaintiffs, citing to the Defendants' own experts, argue that the identity and size of fibers as well as their potential to become airborne are critical for determining whether asbestos poses a health hazard. Therefore, Plaintiffs contend that the purported flaws in EMSL's testing impact the defense experts' ability to opine about environmental exposure and causation. Specifically, Plaintiffs submit that EMSL's testing as performed does not provide the fiber size for 32 of the 35 soil samples.[108] Plaintiffs further submit that EMSL's Supplemental Report shows that EMSL only detected crocidolite in 8 of the 35 soil samples, with 6 of those 8 samples representing "trace" asbestos.[109]

---

[106] Fed. R. Evid. 702 advisory committee's note to 2000 Amendment.

[107] Rec. Doc. 604 at 2.

[108] Rec. Doc. 618 at 9.

[109] *Id.* at 2 (citing Rec. Doc. 609-2).

Still, taking Dr. Case and Dr. Crapo in turn, Defendants assert that it is Dr. Case's opinion that the asbestos found in the soil samples "most likely got there when the [Johns-Manville] scrap material was being deposited throughout the neighborhood around 1950 to 1955."[110] Defendants submit that Dr. Case's opinion is based on the following: the "asbestos was detected [by EMSL] in 33 of 35 samples," the asbestos was distributed near the surface, and testimonial evidence that indicates that scrap material was deposited on the sampled properties.[111] Defendants also submit that Dr. Case testified that "finding even a single fiber of crocidolite in a sample indicates the presence of crocidolite which conveys risk for mesothelioma and signifies a potential exposure to crocidolite which can and does cause mesothelioma."[112] Similarly, Bayer asserts that it is Dr. Crapo's opinion that "the asbestos identified in the [ ] soil samples is consistent with asbestos historically associated with the [Johns-Manville] plant and that nearby residents likely would have been exposed through environmental pathways."[113]

Under Rule 702, an expert may testify only if the expert's "testimony is based on sufficient facts or data." The factual basis of an expert's opinion generally goes to the weight—not the admissibility—of that expert's testimony.[114] However, "in some cases 'the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that

---

[110] Rec. Doc. 604 at 20.

[111] *Id.*

[112] *Id.* In their reply, Plaintiffs argue that the "single fiber" theory has been rejected by courts in this District. However, this issue has not been fully briefed by both parties. The Court, therefore, does not address this issue here.

[113] Rec. Doc. 609 at 12.

[114] *Jacked Up, LLC v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020) (internal quotation marks omitted); *Moore v. Int'l Paint, LLC*, 547 F. App'x 513, 515 (5th Cir. 2013) ("Generally, the fact-finder is entitled to hear an expert's testimony and decide whether the predicate facts on which the expert relied are accurate.").

opinion.'"[115] Specifically, "expert testimony that relies on completely unsubstantiated factual assertions is inadmissible."[116]

Here, both experts find factual support in the EMSL testing and the Terracon report, in addition to other evidence relating to the property's condition and the Johns-Manville Plant. Therefore, the Court finds that neither expert necessarily relies on "completely unsubstantiated factual assertions."[117]

Furthermore, Rule 702 requires that "[an] expert's opinion reflect[ ] a reliable application of the principles and methods to the facts of the case." The Supreme Court has permitted exclusion of expert testimony where a district court "concludes that there is simply too great an analytical gap between the data and the opinion proffered."[118] Ultimately, Dr. Crapo and Dr. Case's testimony, which is supported by the EMSL testing and the Terracon report in addition to other evidence, do not amount to an unreliable application of the testing to the facts as a matter of course.

The Court, therefore, declines to exclude Dr. Crapo and Dr. Case's expert testimony pertaining to the EMSL testing to the extent that Dr. Crapo and Dr. Case use such testing to support their opinions that Johns-Manville scrap material was likely deposited on the property.

***b. The Court's Rule 702 Relevance Inquiry.***

Under Rule 702, an expert may testify (and introduce scientific evidence) when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or

---

[115] *Jacked Up, LLC*, 807 F. App'x at 348 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

[116] *Int'l Paint, LLC*, 547 F. App'x at 515.

[117] *Id.*

[118] *Joiner*, 522 U.S. at 146.

to determine a fact in issue."[119] "Assisting the trier of fact means 'the trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument.'"[120] However, the Fifth Circuit has been clear that "the helpfulness threshold is low" because the inquiry is "principally a matter of relevance."[121]

Here, Plaintiffs argue that the 2026 EMSL testing, the Terracon report, and all expert testimony relying upon the testing are not helpful to the trier of fact because they are not representative of the issues the jury will be asked to assess. The fact at issue, according to Plaintiffs, is whether Decedent could have been exposed to asbestos "released from soil" at the sampled locations.[122] The crux of Plaintiffs' argument is that neither 2026 EMSL testing nor the Terracon report speak to whether asbestos found in the soil in 2026 either existed in the soil during the pertinent time period (that is, when Decedent may have visited the sampled locations) or posed a risk of disease (that is, whether those asbestos particles could become airborne).

The Court finds Plaintiffs' arguments unpersuasive. Defendants conducted the 2026 EMSL testing and procured the Terracon report to support Defendants' Johns-Manville defense. It is Defendants' position that Johns-Manville distributed asbestos-containing scrap to neighborhoods on the Westbank around the 1940s and 1950s. Defendants' expert witnesses opine that the testing and report confirm that asbestos-containing scrap from the Johns-Manville plant was deposited on

---

[119] Fed. R. Evid. 702; *see also Daubert*, 509 U.S. 579 (1993).

[120] *Puga*, 922 F.3d at 293–94 (quoting *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992)) (alterations in original).

[121] *Id.* (citing *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 459 n.14 (5th Cir. 2013) (en banc)) (cleaned up).

[122] Rec. Doc. 591-1 at 4.

the sampled property, which Defendants argue helps prove their alternative-exposure theory.[123] Defendants' experts purportedly form their respective opinions while recognizing that the 2026 testing does not establish that there was asbestos in the soil at the pertinent time period or whether the discovered asbestos particles were ever airborne.[124] The jury will ultimately be asked to assess Defendants' Johns-Manville defense, and Plaintiffs will have the opportunity at trial to show the jury any flaws in the testing and the experts' opinions. Therefore, the Court finds that the Defendants have satisfied their burden in establishing by a preponderance of the evidence that EMSL testing and the Terracon report are helpful to the trier of fact (and, therefore, relevant).

**2. Whether the EMSL testing should be excluded under Rule 403.**

Scientific evidence or expert testimony that satisfies Rule 702's admissibility requirements may nevertheless be excluded under Rule 403, where a court finds that the evidence's probative value is substantially outweighed by a danger of unfair prejudice, confusing of the issues, or misleading the jury. Notably, it can be difficult for a trier of fact to evaluate scientific evidence or expert testimony, which potentially makes such evidence "both powerful and quite misleading."[125]

As a general matter, however, "[b]ecause Rule 403 requires the exclusion of relevant evidence, it is an extraordinary measure that should be used sparingly."[126] Furthermore, all "[r]elevant evidence is inherently prejudicial."[127] Therefore, Rule 403 permits the exclusion of relevant evidence only where its probative value is *substantially outweighed* by a danger of unfair

---

[123] Rec. Doc. 604, 609.

[124] *See id.*

[125] *Daubert*, 509 U.S. at 595.

[126] *Morris*, 79 F.3d at 411.

[127] *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979).

prejudice (that is, "an undue tendency to suggest [a] decision on an improper basis"), confusion of issues, or misleading the jury.[128]

***a. The EMSL testing in its entirety.***

Plaintiffs request that the Court exclude the EMSL testing in its entirety, the Terracon report, and any expert testimony relying on such testing under Rule 403. Plaintiffs submit that any probative value EMSL's testing may have is substantially outweighed by the risk of prejudice and the likelihood of confusing the issues and misleading the jury for the same reasons articulated in their Rule 702 challenge. Plaintiffs argue that because the 2026 EMSL testing is not representative of the soil's condition in the 1950s, 1960s, or 1970s, the testing and expert testimony will "undoubtedly mislead the jury and confuse the issues."

For the reasons articulated in the Court's relevancy analysis above, the EMSL testing and the Terracon report are probative to Defendants' Johns-Manville defense. Specifically, the expert testimony relying on or finding support in the EMSL testing supports Defendants' contention that some of the asbestos-containing scrap material distributed by Johns-Manville in the 1940s and 1950s was deposited on the sampled property and may have exposed Decedent to asbestos particles. Certainly, the evidence is harmful to Plaintiffs' case, but the evidence is not so unfairly prejudicial that the risk of unfair prejudice substantially outweighs its probative value. Nor does the likelihood of confusing the issues or misleading the jury substantially outweigh the EMSL testing's probative value.

Any flaw in Defendants' soil sampling is best addressed through the adversarial process, not wholesale exclusion. Specifically, Plaintiffs may attack the weight of the EMSL testing and expert testimony relating to the testing at trial, through cross-examination and the presentment of

[128] Fed. R. Evid. 403 advisory committee's note.

contrary evidence. In fact, Plaintiffs intend to present an air monitoring expert and report regarding 2026 air conditions at the sampled property to rebut Defendants' soil sampling.[129] Ultimately, given the presumption against exclusion, the Court finds it inappropriate to exclude the EMSL testing in its entirety, the Terracon report, and expert testimony relying upon the testing on the basis of Rule 403.

***b. The EMSL testing pertaining specifically to the Neighboring Properties (Sample Locations B-1 through B-16).***

Plaintiffs similarly submit that any probative value of the EMSL testing pertaining to the Neighboring Properties is substantially outweighed by the likelihood that it will prejudice the jury as well as confuse and mislead the jury. At the core of this argument is Plaintiffs' contention that there is no evidence which establishes that the Dandry family ever owned or that Decedent ever visited the Neighboring Properties, making this testing irrelevant. However, the record and the parties' memoranda demonstrate the opposite. First, determining the ownership of the Neighboring Properties is inconsequential to the relevance inquiry here. A person does not need to own a parcel of property to have been exposed to asbestos there. Instead, the parties' arguments regarding ownership go to the weight of the evidence, which is a question properly addressed by the jury. Second, whether Decedent ever visited the Neighboring Properties is clearly a fact in issue. Decedent's two sisters have testified in relation to this matter, and both Plaintiffs and Defendants find support for their competing theories in the sisters' testimony regarding potential exposures on the Neighboring Properties. Again, the parties' arguments regarding Decedent's potential contact with the Neighboring Properties go to the weight of the evidence. Therefore, the Court finds that this evidence is not unfairly prejudicial considering its probative value. Therefore, and given the

[129] Rec. Doc. 671.

presumption against exclusion, the Court also finds it inappropriate to exclude the EMSL testing pertaining to the Neighboring Properties (Sample Locations B1 through B16) based on Rule 403.

## V. Conclusion

For the foregoing reasons, the Court finds that the whole sale exclusion of the 2026 EMSL testing, the Terracon report, and expert testimony relying on such testing inappropriate under Federal Rules of Evidence 702 or 403. The Court also finds it inappropriate to exclude the 2026 EMSL testing specifically pertaining to the Neighboring Properties (Sampled Locations B-1 through B-16) under Rule 403. Accordingly,

**IT IS HEREBY ORDERED** that the Motion to Exclude Testing Performed by EMSL Analytical, Inc. and All Expert Testimony Relying Upon the Testing[130] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this 28th day of October, 2026.

Nannette Jolivette Brown

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

[130] Rec. Doc. 591.